CLARK COLERIDER *et al.*

*v.*

CENTRAL NATIONAL BANK OF BUCKHANNON *et al.*

(No. 9694)

Submitted April 25, 1945.   Decided June 12, 1945.

Submitted on Rehearing January 15, 1946.
Decided March 5, 1946.

*Jerome V. Hall, Myron B. Hymes,* and *Maxwell & Young,* for appellants.

*F. E. Parrack* and *U. G. Young, Jr.,* for appellees.

Fox, Judge:

This suit was instituted in the Circuit Court of Upshur County by Clark Colerider, C. J. Gibson, U. G. Young, Jr., Executor of the Estate of Mary A. Gibson, deceased, Sanford Graham and L. O. Martin, against Central National Bank of Buckhannon and others, for the purpose of requiring the return to complainants of collateral aggregating sixteen thousand dollars, and consisting of government bonds and notes secured by trust deeds, because the collateral agreement, the performance of which they had been pledged to secure, had been fully performed and their liability thereunder thereby ended. The guaranty of the complainants applied to a note made by the Pecks Run Coal Company and payable to William Post for $15,243.55-5/9 which the defendant bank held as collateral.

From a decree in favor of the plaintiffs entered April 28, 1942, the defendants appealed, and this Court, in June, 1943, reversed the decree of the trial chancellor, holding in effect that certain collateral pledged by William Post to the Trader's National Bank of Buckhannon was deposited for the purpose of securing both his direct and indirect obligations and that the cause required further development in two respects. Upon remand the trial chancellor found that upon the payment of the sum of $480.62 to the defendants, the plaintiffs were entitled to the return of their securities. This appeal was allowed the defendants below. A thorough statement of the facts and circumstances giving rise to the differences then passed upon and now before this Court in part, will be found in *Colerider* v. *Central National Bank of Buckhannon,* 125 W. Va. 760, 25 S. E. 2d 903, and nothing more than a skeleton resume' will be attempted now.

In August, 1926, William Post conveyed in fee to Pecks Run Coal Company a tract of 449.12 acres for the sum of $157,192, $20,000 of which was paid and a vendor's lien retained to secure notes for the balance equally divided into nine yearly payments of $15,-243.55-5/9 each. The deed contained a covenant that the standing timber upon the tract conveyed would not be removed until after the retirement of the first five notes, unless otherwise mutually agreed upon. In 1928 Post deposited the ninth note with the Trader's National Bank for the purpose of securing his indebtedness to that bank, estimated at that time to amount in direct obligations to $15,000, and in indirect obligations to $40,000. Post was then a director of the Trader's National Bank.

The affairs of Trader's National Bank, on October 15, 1931, were placed in the hands of a receiver. At that time William Post's insolvency was beyond question, the value of his assets being not less than $20,000 under the aggregate of his liabilities. Upon an examination of the records of the Trader's National Bank it became at once apparent that it had over-extended credit to a number of its directors, and to William Post in particular. It was, therefore, of some importance to all of the directors to arrange the affairs of Trader's National Bank to the end that care would be taken of its indebtedness, consisting very largely of that to depositors. This gave rise to a reorganization plan, under which its assets would be taken over and its liabilities assumed, with the approval of the receiver, by a new banking institution to be known as Central National Bank of Buckhannon.

Among the largest assets held as collateral by the Trader's National Bank, to secure the indebtedness of William Post, was the ninth note in the series of vendor's lien notes executed by Pecks Run Coal Company, payable to Post. The value of the coal company's land had shrunk considerably, and, in appraising that note's value, the receiver discovered that Hurst H. Koblegard,

or Koblegard Company, was the holder by assignment from Post of the second note of the same series, and claimed to be entitled to priority of payment due to the fact that its assignment antedated that to the Trader's National Bank, and that consequently it was doubtful whether the note in question was worth face value. He therefore insisted that its value be underwritten as a condition to his approval of the plan of reorganization. This attitude put the matter squarely up to the directors of the Trader's National Bank, and led to the negotiations detailed in the opinion announced on the first hearing of the case. Those negotiations occurred in the year 1932, and resulted in the execution of the agreement of guaranty secured by collateral that is now in dispute.

That agreement, copied in full in this Court's opinion upon the first appeal, reads as follows:

"In consideration of the reorganization and reopening of the Traders National Bank of Buckhannon, and in further consideration of our release from all liability under the law for any excess loans alleged to have been made by the board of directors for and on behalf of said Traders National Bank, we, whose names are hereunto signed, and affixed, propose to Roger E. Brooks, Receiver of said Bank and to the reorganization committee, of which Ed. C. Young is chairman, to place with the Receiver of said Bank securities entirely satisfactory to the said Receiver, and to the said committee in the amount set opposite our respective names, to be held by them as a guarantee to the payment to the said Receiver or to the vendee of said Receiver, or to the reorganized bank, the note esecuted by the Pecks Run Coal Company to William Post, dated August 30th, 1926, calling for the sum of $15,243.59-5/9, and by said Post endorsed to the Traders National Bank, and held by said Bank as collateral security for certain debts owing by said Post to said Bank, the aggregate amount of said note not to exceed $20,000.00, provided, however, that any interest accumulated on said securities pending the liquidation of the Post obligation is to be paid

to us, and any party signing this writing shall have his name stricken from the guarantee bond dated May 17th, 1932, and this writing shall be a substitute of our names on said bond, and provided further that we shall not be liable for any further amount than that fixed opposite our signatures hereto.

We submit this paper with the bond signed by the remaining directors of the bank as our guarantee, the two papers to be taken together and read as a whole.

In the event of the payment of the Post obligations to said bank out of his property, or by him, without loss to the bank then the securities are to be returned to us.

Dated this 27th day of June, 1932.

| | |
|---|---|
| C. W. GIBSON | $5,000.00 |
| CLARK COLERIDER | $5,000.00 |
| SANFORD GRAHAM | $3,000.00 |
| L. O. MARTIN | $3,000.00" |

The "bonds" referred to in the above writing will be found copied in our former opinion in this case. Clearly, the above writing was executed with knowledge of such "bonds" executed by other directors.

In our opinion this paper admits but one construction of its express language. It was to guarantee payment of sixteen thousand dollars upon a note, the aggregate amount of which, meaning principal plus interest, should not exceed twenty thousand dollars. There could have been but one purpose in fixing the limitation in amount upon the indebtedness, the payment of which was guaranteed in part, and that was not only to limit the liability in amount, but to limit the indebtedness to the reduction of which credits from all sources were to be applied. Substantial credits upon the Pecks Run note were expected at the time the guaranty agreement was executed, and there can be no doubt but that the guaranty agreement was offered and accepted with the thought in mind that those payments would operate to reduce the amount guaranteed by the amount of the pay-

ments. It was not anticipated, of course, that the amount of the Pecks Run Coal Company note in principal would be $15,243.55-5/9 without interest. It was known that it would take some little time to reduce that note to money, and that is the reason that the aggregate value of the note secured by the guaranty was fixed at the amount of $20,000, which was more than the interest and principal then due. · The fact that the guarantors, the plaintiffs here, and the guarantors of $4,000, did insure the payment of more than the principal, plus interest then due, at $20,000, we believe is quite clearly indicative of the fact that it was not their intention to permit future interest to increase their liability or guaranty beyond the amount of $20,000. Furthermore, upon the former appeal the legal effect of the paper of June 27, 1932, was before this Court and was decided. We there held: "* * * Those who signed that agreement did not want to guarantee the whole of the Pecks Run Coal Company note, or the whole of the $20,000.00 which was apparently required to be guaranteed in support of the William Post paper, nor did any one of the four men who signed the said paper desire to become responsible beyond a certain amount. The writing speaks for itself, and shows what each signer undertook to do. The aggregate liability was limited to $16,000.00, and individual liability was as stated in the agreement. * * *". We believe that this language settles the law of the case, and that it is comparatively plain that the signers of the paper of June 27, 1932, guaranteed the payment from all sources of $16,000 on the ninth note of the Pecks Run Coal Company. They neither guaranteed its entire payment nor the payment of $20,000 thereon. They did guarantee the payment of $16,000, and it is beyond controversy that more than that amount has been paid; but whether the payments made should inure to the benefit of the plaintiffs alone to an amount sufficient to relieve them of all liability on their guaranty, or to them and the guarantors of the $4,000, as well, is one of the questions to be determined on this appeal.

On the former appeal in this case, the paramount question involved was whether the guaranty of the plaintiffs, then under consideration, covered both the direct and indirect liabilities of William Post to the Trader's National Bank. We held that the guaranty covered both characters of liability. No question was raised on that appeal as to certain payments on the Pecks Run note held by the Central National Bank, which admittedly had been made. It was stipulated on the record then before us, and which is considered on the present appeal, that the sum of $5,106.58 had been paid to Central National Bank on the Pecks Run $15,243.59-5/9 note held by that bank as collateral, and that such payments were reflected in the credits on the notes of William Post to Trader's National Bank on the direct obligations of said Post. From other sources in the record, it is clear that this sum was paid by John S. Stump, Trustee, and derived from royalties collected from the operation of the coal of Pecks Run Coal Company. At another point in the record it is stipulated that when the Pecks Run Coal Company property was sold there was realized therefrom the sum of $6,082.51, which was applied as a credit on the $15,243.59-5/9 note then held by Central National Bank, under transfer from the liquidating official of Trader's National Bank. It likewise appears from that record, and is unquestioned, that the sum of $5,000 was paid to Central National Bank, in compromise of what may be termed a deficiency decree against Pecks Run Coal Company, after the sale of its property, and the application of the proceeds thereof. These payments aggregate $16,189.09. Our former opinion refers to these payments and states that no question had arisen in respect thereto. Therefore, we are now warranted in accepting as true that what had been actually paid and credited at that time was $16,189.09.

But a question arose on the former appeal as to whether a further credit should be allowed on account of dividends possibly received from the William Post bank-

ruptcy proceeding. The record, as then made up, did not disclose whether any sum had been received from that source. We indicated that that question could be easily settled by inquiry as to whether the Pecks Run Coal Company note of $15,243.59-5/9 held by the bank had been filed in said bankruptcy proceeding. The record now before us does not disclose that the note was filed in said bankruptcy, and therefore we are warranted in holding that, as held by the court below, plaintiffs are not entitled to any credit on account of any supposed payment from that source.

Still another question was left open in the former opinion, and that was in respect to the person who should be made responsible, or who should be required to assume liability on account of the failure to prevent the removal of the timber from the land sold by Post to Pecks Run Coal Company. We held that the record as then presented was not sufficient to warrant the Court in making any holding on that point; and the case was remanded with direction to ascertain the true situation in respect thereto. On the remand of the case, there was a finding by the trial court that the value of the timber removed from said land was $1,882.33; that the timber had been removed at various times and an arbitrary date, January 1, 1937, was fixed by the commissioner and the court, as the proper date for fixing the credit for the value of the timber so removed. The lower court held, in effect, that Central National Bank should have protected the collateral in its care by taking steps to prevent the removal of the timber, or in some manner causing the value thereof to be applied as a credit on the second or ninth of the Pecks Run Coal Company notes then unpaid. It was unimportant on which note it was applied, that is, whether on the note held by Koblegard, or the note held by Central National Bank. If applied on the Koblegard note, it would reduce the amount due on that note, and when the coal company's property was finally sold the Koblegard obligation would have been reduced to that extent, and the payment to

Central National Bank on the note it held would have been accordingly increased. The evidence as to who should be made responsible for this failure to protect the collateral is not satisfactory; but we do not feel that, in the circumstances, the finding of the trial court should be disturbed on that point. Generally speaking, the law favors a surety or guarantor, and requires reasonable diligence on the part of the holder of collateral to protect the same. Plaintiffs were not accommodation guarantors, but even so, we think the rule stated should influence our decision. We think it needless to cite authorities on these two propositions. Suffice it to say, that we are of the opinion that, in all the circumstances of this transaction, the trial court did not err in holding that the sum of $1,882.33, the value of the timber, should have been credited on the Pecks Run Coal Company notes, then held by either Koblegard or Central National Bank; and did not err in decreeing that, the Koblegard note having been paid in full, said sum should have been credited on the note held by Central National Bank. But we do not think there should have been any interest allowed on said sum, and that, in that respect, the trial court erred. The guaranty of the plaintiffs was a fixed one. No interest could accumulate thereon. All that the plaintiffs were entitled to in equity was the application of this sum as a credit on the Pecks Run Coal Company note at the time the timber was removed, arbitrarily fixed as of January 1, 1937. The effect of allowing interest would have been to increase the credit, while at the same time the guaranty was not, and could not, be increased. Over a long period of time the interest would reach the maximum of the amounts which may have been due on the guaranty. It is fair to all parties to give credit at the time the timber was removed without interest.

As we have indicated above, the amount paid on the Pecks Run Coal Company note held by Central National Bank, and made up of the payments made by John S. Stump, Trustee, the amount received from the sale of

the property of the coal company, and the amount paid by the coal company in settlement of the deficiency judgment, aggregate $16,189.09. If we add to that sum $1,882.33, the value of the timber, the total of all amounts paid on the Pecks Run Coal Company note held by Central National Bank is $18,071.42. We fix that amount because this conclusion is established by stipulations and indisputable facts appearing upon the face of the records here considered.

This being true, the question arises whether the sum so fixed, $18,071.42, should be applied to the total liquidation of the guaranty of the plaintiffs, or whether it should be applied to the $20,000 guaranty, made up of the $16,000 guaranty of plaintiffs, and the $4,000 guaranty of the other directors. In our opinion, the only equitable application of this total sum so paid is to apply the same to the two guaranties, in the proportion they bear to the total of $20,000, which was required to be guaranteed as a prerequisite to the opening of the Central National Bank. It must be borne in mind that these guarantors, both the plaintiffs and the other directors, were interested, not only in consummating the plan to clear up the affairs of the Trader's National Bank by the opening of the new bank, but they were also interested in being released of any responsibility which might have been threatened or asserted against them on account of excessive loans made by the Trader's National Bank to various persons, firms, and corporations. Such release is expressly made a consideration for the guaranties, and the members of the board of directors were jointly and severally involved as to responsibility for any improper conduct in the management of the Trader's National Bank. The interest of all the directors was common. There is nothing in this record which supports the theory that one director, or group of directors, should be preferred over another. This being true, the application of the sum of $18,071.42, actually paid on the Pecks Run Coal Company note held by Central National Bank, becomes a mere matter of calcula-

tion.   Plaintiffs in this case guaranteed $16,000, or eighty per cent, of the $20,000 indemnity required; other directors guaranteed $4,000, or twenty per cent thereof.   That was the proportion in which they were liable, and that is the proportion in which the payments on said note should be applied.   Calculating on that basis, the sum of $14,457.14 should be applied on the plaintiffs' guaranty, and $3,614.28 should be applied on the guaranty of the other directors.   When we deduct $14,457.14 from the $16,000 guaranty of the plaintiffs, we have a balance of $1,542.86.   That is the amount which the plaintiffs should pay to Central National Bank, in order to be entitled to the securities they deposited as collateral for the payment of their guaranty.   Fixing the entire amount which the plaintiffs are required to pay, does not mean that they are jointly and severally liable to pay that sum.   In their guaranty, they fixed the amount for which each individual was willing to become liable.   Of the $16,000 guaranteed, Clark Colerider agreed to be responsible for $5,000; C. W. Gibson for $5,000; Sanford Graham and L. O. Martin each for $3,000.   Their liability on account of the $1,542.86 aforesaid should be fixed in the same proportion: Clark Colerider should pay $482.15; the Executor of Mary A. Gibson, deceased, now representing the C. W. Gibson estate, should pay $482.15; Sanford Graham and L. O. Martin should each pay the sum of $289.28, all of these sums to be paid to Central National Bank of Buckhannon; and, upon payment thereof, that bank should surrender to each of the plaintiffs the securities or other collateral filed by him to secure payment of his guaranty, and execute and deliver all releases and other papers necessary fully to effectuate a surrender of the securities or other collateral so filed.

We therefore reverse the decree of the Circuit Court of Upshur County, and remand the cause with directions to enter a decree carrying into effect our holdings here-

in.  Costs in this Court will be awarded to the appellants as the parties substantially prevailing.

*Reversed and remanded with directions.*